**United States District Court**
**District of Massachusetts**

```
_____
                                )
NExTT SOLUTIONS, LLC,           )
                                )
          Plaintiff,            )
                                )
          v.                    )     Civil Action No.
                                )     15-10562-NMG
XOS TECHNOLOGIES, INC. d/b/a XOS )
DIGITAL,                        )
                                )
          Defendant.            )
_____ )
```

**MEMORANDUM & ORDER**

**GORTON, J.**

This breach of contract action is brought by plaintiff
NExTT Solutions, LLC ("NExTT") against defendant XOS
Technologies, Inc. d/b/a XOS Digital ("XOS").  In 2009, NExTT
entered into a comprehensive licensing agreement with XOS's
predecessor-in-interest, StratBridge, LLC ("StratBridge"),
whereby it granted StratBridge an exclusive license to use,
market and sell its proprietary software for player scouting to
teams in the National Football League ("NFL") in exchange for
royalties.  NExTT alleges that both StratBridge and XOS
subsequently breached the agreement and, to the detriment of
NExTT, XOS persists in withholding royalties owed.

Now pending before the Court is defendant's motion to
dismiss all counts of the complaint.  For the reasons that

-1-

follow, the motion will be allowed, in part, and denied, in part.

I.  **Background**

    A.  **Parties**

NExTT is an Indiana limited liability company with its principal place of business in South Bend, Indiana.[1]  XOS is a Delaware corporation with its corporate headquarters in Wilmington, Massachusetts and Orlando, Florida.  Both parties offer a variety of sports software to professional and collegiate leagues and organizations.

    B.  **2009 License Agreement between NExTT and Stratbridge**

In 2009, NExTT's flagship product was a comprehensive software program sold to NFL teams to create both scouting reports on future opponents and to evaluate college players in anticipation of the annual NFL Draft ("the NFL Scouting Program").  NExTT was approached by Stratbridge, the predecessor-in-interest of XOS, about obtaining an exclusive license from NExTT on its NFL Scouting Program.  By that time, NExTT had licensing agreements for that program in place with eight NFL teams and was in the final stages of negotiating a license with a ninth team.  Stratbridge, on the other hand, had only limited contracts with various NFL teams for its ticketing

---

[1] Its membership consists of four individuals who are citizens of Illinois, Indiana, Georgia and Utah.

software services.  Thus, according to NExTT, Stratbridge saw
its NFL Scouting Program as an attractive business opportunity
for expanding Stratbridge's connections within the lucrative NFL
market.

In pitching its own experience, technological capabilities
and sales and support staff to NExTT, Stratbridge purportedly
represented that it would be able to convince between one and
six new NFL teams per year to adopt the NFL Scouting Program
over the next five years.  Stratbridge also represented that the
projected total revenue stream during that five-year time period
would be between $5.9 million and $8.4 million.

On the basis of such representations, which NExTT now
contends Stratbridge knew were false, NExTT agreed to enter into
a multi-faceted license agreement for the NFL Scouting Program.
In May, 2009, the parties executed the agreement, titled
"Technology License and Assignment Agreement" ("the License
Agreement").

The License Agreement granted Stratbridge the exclusive
right to use the NFL Scouting Program, and all of its
accompanying technology and intellectual property, for the
purpose of developing, marketing and selling its "Royalty
Bearing Products" ("RBPs").  RBPs were defined as "any software
product that incorporates, builds upon or extends" the NFL
Scouting Program.  In exchange for that exclusive license,

Stratbridge agreed to remit bi-monthly to NExTT 18.5% of all product revenues ("the Revenue Share") it received for RBPs for a five-year period.[2]

Stratbridge committed to use "commercially reasonable efforts" to pursue agreements with NFL teams for RBPs for the first two years after May 29, 2009, i.e., the effective date of the License Agreement.  Further, NExTT agreed to provide ongoing services through April, 2010 to ensure a smooth transition for both Stratbridge and the NFL teams under preexisting contracts. NExTT also assigned to Stratbridge all of its then current license agreements for the NFL Scouting Program.

Of importance to NExTT, Section 7(d) of the License Agreement established a "Minimum Revenue Share".  Regardless of the success of Stratbridge's efforts to increase the licensing of the NFL Scouting Program throughout the NFL, the parties agreed that

> NExTT shall be entitled to receive a minimum amount of $2,000,000 in aggregate Revenue Share payments (the "Minimum Revenue Share") as compensation [for the exclusive license and ongoing assistance and training to Stratbridge].

If the Minimum Revenue Share was not received by NExTT by the end of the original five-year license period, the royalty term

---

[2] An exception was made for revenue received by Stratbridge from a particular NFL organization during the remainder of 2009, for which Stratbridge was to remit 90% of the revenue to NExTT.

was to be automatically extended for an additional three-year period.  Thus, the License Agreement called for a maximum term of eight years if the Minimum Revenue Share was not paid to NExTT before May 29, 2014.  Moreover, Stratbridge had an incentive to ensure that the Minimum Revenue Share was remitted to NExTT within the original five-year term because, if it failed to do so, NExTT was entitled not only to the $2 million minimum but also to any additional Revenue Share above and beyond that amount that was generated from years five through eight.

NExTT agreed that if it received at least the Minimum Revenue Share, it would assign its rights to the NFL Scouting Program and accompanying technology and intellectual property to Stratbridge permanently.

### C.   Contractual Breakdown

NExTT contends that while Stratbridge made some Revenue Share payments, it failed to do so in a timely manner or in the full amount owed.  NExTT repeatedly communicated its disapproval of Stratbridge's performance to no avail.

In June, 2012, XOS acquired StratBridge's sports software and data management division in an Asset Purchase Agreement.  As part of that agreement, XOS expressly assumed all of the obligations owed by Stratbridge to NExTT under the License

Agreement and began utilizing the technology underlying the NFL Scouting Program in its own software product.

In May, 2013, general counsel for XOS purportedly sent an email to NExTT in which he admitted royalties were due to NExTT. NExTT contends that XOS not only has failed to remit those royalties but also has incurred additional royalties since it assumed Stratbridge's obligations in 2012.

Now, more than six years after the execution of the License Agreement, NExTT contends that it has received Revenue Share payments amounting to approximately $129,501, far short of the $2,000,000 Minimum Revenue Share it claims to be owed. In light of XOS's failure timely to remit the Minimum Revenue Share, NExTT claims the license agreement remains in effect until 2017.

## II.  Procedural History

In February, 2015, NExTT filed an eight-count complaint, asserting affirmative claims for breach of contract (Count I), anticipatory breach of contract (Count II), breach of fiduciary duty (Count III), breach of the implied covenant of good faith and fair dealing (Count IV), fraudulent inducement (Count V) and violation of the Massachusetts Consumer Protection Act, M.G.L. c. 93A (Count VIII).  Plaintiff also seeks a declaratory judgment (Count VI) and an accounting of the transactions of both Stratbridge and XOS with NFL teams dating back to May, 2009 (Count VII).  In March, 2015, XOS filed a motion to dismiss the

-6-

complaint for failure to state a claim, pursuant to Fed. R. Civ.
P. 12(b)(6).

NExTT relies on complete diversity of citizenship as the
basis for this Court's federal jurisdiction.  As an LLC,
however, NExTT failed adequately to allege complete diversity
because it did not disclose the identity and state of
citizenship of each of its members.  Accordingly, in May, 2015,
the Court sua sponte issued an order to show cause why the
complaint should not be dismissed for lack of diversity
jurisdiction.  NExTT timely filed a compliant response to the
Court's order that properly alleged complete diversity.

## III. Motion to Dismiss

### A.    Legal Standard

To survive a motion to dismiss, a complaint must contain
sufficient factual matter, accepted as true, to "state a claim
to relief that is plausible on its face." Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 570 (2007).  The Court must accept all
factual allegations in the complaint as true and draw all
reasonable inferences in the plaintiff's favor. Langadinos v.
Am. Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000).  The Court,
however, need not accept legal conclusions as true. Ashcroft v.
Iqbal, 556 U.S. 662, 678 (2009).  Threadbare recitals of the
legal elements, supported by mere conclusory statements, do not
suffice to state a cause of action. Id.  Accordingly, a

-7-

complaint does not state a claim for relief where the well-pled facts fail to warrant an inference of any more than the mere possibility of misconduct. Id. at 679.

In ruling on a Rule 12(b)(6) motion to dismiss, a court "may properly consider only [those] facts and documents that are part of or incorporated into the complaint." Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008). Exhibits attached to the complaint are part of the pleadings and can therefore be considered. Id. (citing Fed. R. Civ. P. 10(c)).

### B.  Analysis

#### 1.  Breach of Contract (Count I)

In order adequately to plead a claim for breach of contract under Massachusetts law, a plaintiff is required to allege that 1) there was a valid contract, 2) the defendant breached its duties under the contractual agreement and 3) the breach caused the plaintiff damage. Stagikas v. Saxon Mortg. Servs., Inc., 795 F. Supp. 2d 129, 136 (D. Mass. 2011).

XOS contends that NExTT failed to plead a material element of its claim for breach of contract because, as a matter of law, the License Agreement does not entitle NExTT to a $2 million minimum revenue share separate and apart from the parties' abilities to generate product revenues. NExTT responds that XOS fails to rebut the crux of its breach of contract claim, i.e.,

that XOS's general counsel admitted in a May, 2013 email that
XOS owed revenue to NExTT under the License Agreement.  NExTT
avers that the continued failure of XOS to remit any royalties
whatsoever warrants the denial of the motion to dismiss with
respect to Count I.

The Court agrees.  Defendant's argument in support of its
motion to dismiss the breach of contract claim misses the mark
and focuses on the factual allegations underlying the alleged
anticipatory breach of contract claim, not the breach of
contract claim.  Count I of the complaint alleges that XOS
breached the License Agreement by 1) failing to make Revenue
Share payments in a timely manner and 2) failing to make
commercially reasonable efforts to pursue agreements with NFL
teams, both to the detriment of NExTT.  Those allegations are
not dependent upon the definition of the Minimum Revenue Share
and are sufficient to survive a motion to dismiss.  Accordingly,
the motion to dismiss the breach of contract claim will be
denied.

### 2.   Anticipatory Breach of Contract (Count II)

NExTT's anticipatory breach of contract claim rests on the
contentions that 1) Section 7(d) of the License Agreement
entitles it to receive a $2 million Minimum Revenue Share
regardless of actual collected revenue and 2) XOS's actions have
indicated an unequivocal repudiation of its obligation to make

-9-

that payment.  NExTT asserts that the repudiation by XOS constitutes an anticipatory breach and thereby entitles NExTT to recover the outstanding amount of $2 million, despite the fact that the agreement was to be automatically extended by three years if the Minimum Revenue Share had not been paid by the end of the initial five-year term.  That extended term has not yet expired.

In moving to dismiss Count II, XOS asserts that Massachusetts law does not recognize a claim for anticipatory breach of contract.  Moreover, XOS argues that even if it did, as a matter of law, NExTT is not entitled to receive a royalty of $2 million in the absence of product revenues.

The Massachusetts Supreme Judicial Court recently affirmed that

> with few exceptions, outside of the commercial law context, Massachusetts has not generally recognized the doctrine of anticipatory repudiation, which permits a party to a contract to bring an action for damages prior to the time performance is due if the other party repudiates.

K.G.M. Custom Homes, Inc. v. Prosky, 468 Mass. 247, 253 (2014) (citing Cavanagh v. Cavanagh, 33 Mass. App. Ct. 240, 243 (1992)) (internal quotation marks and alterations omitted).  That being said, there is a relevant exception that permits a claim for anticipatory repudiation when an actual breach is accompanied by an anticipatory breach. Cavanagh, 33 Mass. App. Ct. at 243 n.6.

Here, NExTT has alleged both a breach of contract and an anticipatory breach sufficient to enable a claim for anticipatory breach of contract.

XOS has, however, also argued that the clear terms of the License Agreement warrant dismissal of Count II of the complaint.  In support, XOS relies on one sentence within Section 7(d) of the License Agreement which states:

> [n]otwithstanding anything to the contrary herein, the Royalty Term shall terminate immediately upon ... the 8th anniversary of the Effective Date regardless of the amount of Revenue Share received by NExTT.

XOS contends that the subject sentence unambiguously establishes that the $2 million minimum was merely a target for the duration of the License Agreement and not a guaranteed minimum royalty.

Contract interpretation under Massachusetts law is ordinarily a question of law for the court. Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995); see also Bank v. Thermo Elemental Inc., 451 Mass. 638, 648 (2008) (the determination as to whether ambiguity exists in contract is question of law).  That being said, if a court determines an ambiguity exists, the meaning of the uncertain language becomes a question of fact for which the trier of fact may consult extrinsic evidence "including the circumstances of the formation of the agreement and the intentions and objectives of the parties." Browning-Ferris Indus., Inc. v. Casella Waste Mgmt. of

Mass., Inc., 79 Mass. App. Ct. 300, 307 (2011).  An ambiguity
can arise when a contract's terms are facially inconsistent or
where the language can support a reasonable difference of
opinion. Coll, 50 F.3d at 1122.

Here, despite assertions of XOS to the contrary, the
contractual language is ambiguous on its face.  Section 7(d)
initially appears unequivocally to ensure that NExTT can do no
worse than a minimum royalty of $2 million.  That expectation
seems eminently reasonable in light of the fact that NExTT
agreed to remove itself as a competitor and to provide vital
services to Stratbridge to ensure a smooth technological
transition for both Stratbridge and the NFL teams that already
had license agreements in place with NExTT.

Section 7(d), however, goes on to state that the Royalty
Term will expire at the end of the extended eight year term,
regardless of the amount of royalties received by NExTT to that
point.  The License Agreement does not otherwise provide that
the Minimum Revenue Share is guaranteed. Cf. Oscar de la Renta,
Ltd. v. Mulberry Thai Silks, Inc., No. 08-civ-4341(RJS), 2009 WL
1054830, at *6 (S.D.N.Y. Apr. 17, 2009) (license agreement
provided for guaranteed minimum royalties regardless of actual
sales).

Thus, the plain language of Section 7(d) appears
contradictory and leaves it unclear whether the parties intended

the Minimum Revenue Term to be a minimum royalty or an aspiration.  The Court cannot therefore say, as a matter of law, that NExTT is not entitled to a $2 million Minimum Revenue Share.

Furthermore, the Court will leave for a later date the issue of XOS's purported repudiation. See John G. Alden Ins. Agency, Inc. v. John G. Alden Ins. Agency of Florida, Inc., No. 02-cv-12147-PBS, 2003 WL 22843069, at *4 (D. Mass. Nov. 26, 2003) ("The question whether a party has repudiated a contract is generally a question of fact for determination by the jury."), vacated on other grounds, 389 F.3d 21 (1st Cir. 2004).

Of final note, more than two months after NExTT filed its opposition to the motion to dismiss, XOS untimely submitted a motion for leave to file a reply brief.  In its proposed reply, XOS attempted to introduce an argument that it never assumed liability for a $2 million Minimum Revenue Share.  Because that legal argument was raised for the first time in a reply brief, it is considered waived for the purpose of the instant motion to dismiss although it may appropriately be repeated in a future dispositive motion. Noonan v. Wonderland Greyhound Park Realty LLC, 723 F. Supp. 2d 298, 349 (D. Mass. 2010).

Accordingly, the motion to dismiss with respect to the anticipatory breach of contract claim will be denied.[3]

### 3.   Breach of Fiduciary Duty (Count III)

In moving to dismiss the claim for breach of fiduciary duty, XOS argues that NExTT impermissibly seeks to transform an ordinary commercial relationship into a fiduciary relationship.

In the commercial context, an ordinary arms-length business relationship can only be transformed into a fiduciary relationship if certain indicia are present. Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp., 44 F.3d 40, 44 (1st Cir. 1995). These include: 1) whether the parties' relationship was one of trust and confidence in one another, 2) whether the plaintiff relied upon the defendant's specialized knowledge or judgment, 3) whether the defendant was aware of that reliance and 4) whether the defendant abused the plaintiff's trust and confidence to its own benefit. Stark v. Advanced Magnetics, Inc., 50 Mass. App. Ct. 226, 234 (2000).  It is not enough, however, simply to show that the plaintiff reposed trust and confidence in the defendant. Indus. Gen. Corp., 44 F.3d at 44; Geo. Knight & Co., Inc. v. Watson Wyatt & Co., 170 F.3d 210, 216 (1st Cir. 1999).

---

[3] Moreover, because the motion to dismiss plaintiff's claim for a declaratory judgment (Count VI) is wholly predicated on the dismissal of Count II, it will also be denied.

This determination involves a question of fact. Indus. Gen.
Corp., 44 F.3d at 44.   Thus, at this stage, drawing all
inferences in favor of the plaintiff, the Court cannot say as a
matter of law that XOS owed no fiduciary duty to NExTT with
respect to its efforts to collect revenue and properly disclose
and remit royalties to NExTT.   Accordingly, the motion to
dismiss Count III will be denied.[4]

### 4.   Breach of the Implied Covenant of Good Faith and Fair Dealing (Count IV)

In Massachusetts, all contracts contain an implied covenant
of good faith and fair dealing, which provides that each party
involved will not

> do anything that will have the effect of destroying or
> injuring the right of the other party to receive the
> fruits of the contract.

K.G.M. Custom Homes, 468 Mass. at 254 (citation omitted).   Such
a covenant exists to ensure that the objectives of the contact
may be realized. Id.

XOS argues that NExTT alleges three conclusory grounds
underlying its claim for a breach of the implied covenant of
good faith and fair dealing, none of which adequately supports
the claim.   In particular, NExTT alleges that XOS breached the

---

[4] Moreover, because the motion to dismiss plaintiff's claim for
an accounting (Count VII) is wholly predicated on the dismissal
of Count III, it will also be denied.

implied covenant by: 1) failing to use commercially reasonable efforts to pursue and secure agreements for RBPs, 2) failing to use commercially reasonable efforts to collect revenue generated by RBPs and 3) failing to market, sell and promote NExTT products.

Pursuant to the explicit language of the License Agreement, Stratbridge was obligated to use commercially reasonable efforts to pursue agreements for RBPs with NFL teams during the first two years of the license.  Thus, by the time XOS assumed Stratbridge's obligations under the License Agreement in 2012, that duty had expired and therefore cannot support NExTT's claim for breach of the implied covenant. See Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385 (2005) ("The scope of the [implied] covenant is only as broad as the contract that governs the particular relationship.")

NExTT has, however, alleged that XOS failed in its obligations under the License Agreement to remit royalties to NExTT after it assumed Stratbridge's obligations under the agreement, thus withholding from NExTT the benefits of its bargain.  That allegation adequately supports a claim for breach of the implied covenant and, accordingly, XOS's motion to dismiss to Count IV will be denied.

### 5.    Fraudulent Inducement (Count V)

In order to state a claim for fraudulent inducement, the plaintiff must allege that the defendant 1) made a misrepresentation of material fact, 2) with the intent to induce action and 3) that the plaintiff reasonably relied on the false statement to his detriment. Commerce Bank & Trust Co. v. Hayeck, 46 Mass. App. Ct. 687, 692 (1999).  A statement of present intention as to future conduct can support a claim for fraudulent inducement so long as "the statement[] misrepresent[s] the actual intention of the speaker and [was] relied upon by the recipient to his damage." Starr v. Fordham, 420 Mass. 178, 187 (1995) (citation omitted).

All of the purportedly false statements that NExTT contends it relied on were made by Stratbridge, not XOS, yet Stratbridge has not been named a defendant in its complaint.  NExTT fails to provide any case law support for its contention that XOS subsequently became responsible for the purportedly false statements made by Stratbridge upon which it relied in negotiating the License Agreement back in 2009.  Accordingly, the motion to dismiss Count V will be allowed.

### 6.    Unfair or Deceptive Trade Practices under Chapter 93A (Count VIII)

Chapter 93A protects entities engaged in business from unfair competition and unfair or deceptive acts or practices.

M.G.L. c. 93A, § 11.  The plaintiff must also prove it suffered

a tangible loss as a result of the unfair or deceptive conduct.

Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 56 (1st

Cir. 1998).

In determining whether a particular practice is unfair,

courts examine

> (1) whether the practice ... is within at least the
> penumbra of some common-law, statutory or other
> established concept of unfairness; (2) whether it is
> immoral, unethical, oppressive, or unscrupulous; [and]
> (3) whether it causes substantial injury to consumers
> (or competitors or other businessmen).

Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552

F.3d 47, 69 (1st Cir. 2009) (alterations in original) (citation

omitted).  The lodestone of Chapter 93A claims is whether the

defendant's actions "would raise an eyebrow of someone inured to

the rough and tumble of the world of commerce." Levings v.

Forbes & Wallace, Inc., 8 Mass. App. Ct. 498, 504 (1979).

Here, plaintiff's Chapter 93A claim relies on 1)

Stratbridge's purportedly fraudulent representations during the

initial negotiations that induced NExTT to enter into the

License Agreement and 2) XOS's alleged deliberate failure to

collect and remit royalties after assuming Stratbridge's

obligations under the License Agreement.  The Court has already

held that the facts underlying NExTT's fraudulent inducement

claim cannot be attributed to XOS and, consequently, those same

allegations cannot support its Chapter 93A claim. <u>See</u> <u>Hannigan</u>
v. <u>Bank of America, N.A.</u>, 48 F. Supp. 3d 135, 142 (D. Mass.
2014) (noting that Chapter 93A claim cannot survive if it is
entirely based on a discredited claim).

Nevertheless, the Court finds that NExTT has alleged a
plausible violation of Chapter 93A on the basis of the purported
refusal by XOS to collect and remit royalties for RBPs,
particularly after admitting that it owed at least some
royalties.  Accepted as true at this juncture, NExTT contends
that XOS's actions were undertaken as part of a scheme to
exploit its "coveted relationships" with NFL teams while
concurrently serving to push NExTT out of the marketplace.

Typically, a mere breach of contract, without more, does
not amount to a Chapter 93A violation but a knowing violation of
a contractual obligation for the purpose of securing unwarranted
benefits can. <u>See</u> <u>Diamond Crystal Brands, Inc.</u> v. <u>Backleaf, LLC</u>,
60 Mass. App. Ct. 502, 507 (2004); <u>Zabin</u> v. <u>Picciotto</u>, 73 Mass.
App. Ct. 141, 169 (2008).  That is precisely what NExTT has
alleged here, i.e., that XOS knowingly withheld royalties while
simultaneously reaping the benefits of utilizing plaintiff's NFL
Scouting Program and its underlying technology.  Moreover, those
same allegations underlie NExTT's claim for breach of the
implied covenant of good faith and fair dealing which, if

proved, also may constitute a Chapter 93A violation. See Mass. Emp'rs Ins. Exch. v. Propac-Mass, Inc., 420 Mass. 39, 43 (1995).

Accordingly, NExTT has stated a colorable claim of a Chapter 93A violation and the Court will deny XOS's motion to dismiss Count VIII.

<b>Order</b>

In accordance with the foregoing,

1)    the motion of defendant XOS Technologies, Inc. d/b/a XOS Digital for leave to file a reply memorandum in support of its motion to dismiss (Docket No. 27) is **DENIED**; and

2)    the motion to dismiss filed by defendant XOS Technologies, Inc. d/b/a XOS Digital (Docket No. 10) is, as to Count V, **ALLOWED** but is otherwise **DENIED**.

**So ordered.**

 /s/ Nathaniel M. Gorton_____
Nathaniel M. Gorton
United States District Judge

Dated July 9, 2015